**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HARVEY TAUBER, Derivatively on Behalf of INTEGRAL AD SCIENCE HOLDING CORP., | |
| Plaintiff, | Case No. 1:25-cv-02039 |
| v. | JURY TRIAL DEMANDED |
| LISA UTZSCHNEIDER, MICHAEL FOSNAUGH, BRIDGETTE HELLER, CHRSTINA LIMA, JILL PUTMAN, ROD ALIABADI, MARTIN TAYLOR, OTTO BERKES, BROOKE NAKATSUKASA, and TANIA SECOR, | |
| Defendants | |
| and | |
| INTEGRAL AD SCIENCE HOLDING CORP., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Harvey Tauber ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Integral Ad Science Holding Corp. ("IAS" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission

("SEC") filings, press releases published by and regarding IAS, legal filings, news reports, securities analysts' reports about the Company, the securities class action captioned *Oklahoma Firefighters Pension and Retirement System v. Integral Ad Science Holding Corp. et al*, 1:25-cv-00847 (S.D.N.Y.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of IAS against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties from at least March 2, 2023, and February 27, 2024 (the "Relevant Period"), as set forth below.

2.      IAS is a global media measurement and optimization platform that analyzes the value of digital advertising placements. The Company's offerings are designed to help advertisers optimize their ad spend and better measure consumer engagement with campaigns across platforms.

3.      Throughout the Relevant Period, the Company touted "increased demand across our product portfolio" and a "[f]avorable pricing structure" as a key "driver[] of sustainable growth," while claiming to have won "several large multiyear deals[.]"

4.      Behind the scenes, however, senior management was aware that demand had started to slow as the Company was experiencing "pricing pressure" in its ad verification and optimization businesses. As a result, IAS had resorted to cutting rates when renewing and securing new contracts, leading to fee compression. Indeed, as senior management had acknowledged in a May

---

[1] The Individual Defendants are Lisa Utzschneider ("Utzschneider"), Michael Fosnaugh ("Fosnaugh"), Bridgette Heller ("Heller"), Christina Lema ("Lema"), Jill Putman ("Putman"), Rod Aliabadi ("Aliabadi"), Martin Taylor ("Taylor"), Otto Berkes ("Berkes"), Brooke Nakatsukasa ("Nakatsukasa"), and Tania Secor ("Secor"). "Defendants" means IAS and the Individual Defendants.

11, 2023 non-public presentation to the Board, one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "Aggressive Pricing."

5.      The truth behind the Company's weakening demand began to emerge on August 3, 2023, when IAS revealed that the growth of its optimization revenue had meaningfully slowed. Following this news, on August 4, 2023, IAS's stock price declined $3.66 per share, or approximately 20%, from a closing price of $18.83 per share on August 3, 2023 to $15.17 per share on August 4, 2023.

6.      The full truth emerged on February 27, 2024, when IAS released 2023 fourth quarter results and announced lackluster revenue guidance below analysts' estimates. During an earnings call held the same day, Chief Executive Officer ("CEO") Utzschneider stated, "[w]e are seeing more competitive pricing in measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements."

7.      On this news, the price of IAS's common stock declined approximately 41%, or $7.09 per share, to a closing price of $10.01 per share on February 28, 2024.

8.      As set forth herein, throughout the Relevant Period the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose that: (i) the Company was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals. As a result, the Individual Defendants caused the

Company's public statements to be materially false and misleading at all relevant times.

9.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

10.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Utzschneider and Chief Financial Officer ("CFO") Secor on January 29, 2025, in the United States District Court for the Southern District of New York.

11.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

12.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of IAS's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein

for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and SEC Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder.

14.      Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.      In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18.      Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, IAS is headquartered in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

### Plaintiff

19.      Plaintiff is and has been a continuous shareholder of IAS common stock since at least September 2021.

### Nominal Defendant

20.      Nominal Defendant IAS is a Delaware corporation with its principal executive offices located at 12 E 49th Street, 20th Floor, New York, New York 10017.  Shares of IAS's

common stock trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "IAS" following the Company's June 30, 2021, initial public offering. In June 2018, IAS sold a majority stake in the Company to Vista Equity Partners Management, LLC ("Vista"). Vista made its investment in IAS through several affiliated funds ultimately controlled by Vista Equity Partners Management, LLC, including Vista Equity Partners Fund VI, L.P.; Vista Equity Partners Fund VI-A, L.P.; and VEPF VI FAF, L.P.

***Individual Defendants***

21.     Defendant Utzschneider has served as a member of the Board and as the Company's CEO since January 2019. As set forth in the proxy statement filed by IAS with the SEC on April 3, 2024 (the "2024 Proxy"), Utzschneider received $10,033,878 in compensation from the Company in 2023. Defendant Utzschneider is also named as a defendant in the Securities Class Action.

22.     Defendant Fosnaugh has served as a member of the Board since June 2018 and currently serves as the Chair of the Board. Fosnaugh is a Senior Managing Director at Vista, where he is also Co-Head of the Flagship Fund and sits on its Investment Committee. Fosnaugh also serves as a member of Vista's Executive Committee, Vista's governing and decision-making body for all matters affecting its overall management and strategic direction, and Vista's Private Equity Management Committee, the decision-making body for matters affecting Vista's overall private equity platform. Fosnaugh has also served as a director of Jamf Holding Corp since 2017.

23.     Defendant Heller has served as a member of the Board since May 2021. Defendant Heller also serves as a member of the Board's Audit Committee. According to the 2024 Proxy, Heller received $249,994 in compensation from the Company in 2023.

24.     Defendant Lema has served as a member of the Board since June 2021. Defendant

Lema joined Vista in February 2012 and currently serves as Managing Director, Deputy Chief Legal Officer and General Counsel. Lema also serves as a member of Vista's Private Equity Management Committee. Lema has also served as a director of Jamf Holding Corp since 2020.

25.    Defendant Putman has served as a member of the Board since June 2021 and as the Company's Interim CFO since January 2025. In connection with her appointment as Interim CFO, Putman stepped down from her position as a member and the Chair of the Board's Audit Committee. Putman served as the Chief Financial Officer of Jamf Holding Corp. from 2014 until September 2022. According to the 2024 Proxy, Putman received $269,994 in compensation from the Company in 2023.

26.    Defendant Aliabadi has served as a member of the Board since June 2018. Defendant Aliabadi also serves as Chair of the Board's Compensation and Nominating Committee. Aliabadi is a Managing Director at Vista and sits on the Flagship Funds' Investment Committee.

27.    Defendant Taylor has served as a member of the Board since June 2018. Defendant Taylor also serves as a member of the Board's Compensation and Nominating Committee. Taylor is Vista's Co-Head of the Foundation Funds and sits on its Investment Committee. Taylor also serves as a member of Vista's Executive Committee and Vista's Private Equity Management Committee. Taylor has also served as a director of Jamf Holding Corp since 2017.

28.    Defendant Berkes has served as a member of the Board since August 2020. Defendant Berkes also serves as a member of the Board's Audit Committee. According to the 2024 Proxy, Berkes received $249,994 in compensation from the Company in 2023.

29.    Defendant Nakatsukasa has served as a member of the Board since December 2020. Defendant Nakatsukasa also serves as a member of the Board's Compensation and Nominating Committee. Nakatsukasa currently is a Vice President on the Vista's private equity Flagship team.

30.     Defendant Secor served as the Company's CFO from 2022 until January 3, 2025, when the Company announced her departure. According to the 2024 Proxy, Secor received $5,958,083 in compensation from the Company in 2023. Defendant Secor is also named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of IAS, and because of their ability to control the business and corporate affairs of IAS, the Individual Defendants owed IAS and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage IAS in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of IAS and its shareholders.

32.     Each director and officer of the Company owes to IAS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of IAS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     To discharge their duties, the officers and directors of IAS were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of IAS, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37.    To discharge their duties, the officers and directors of IAS were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of IAS were required to, among other things:

(i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York, Delaware, and the United States, and pursuant to IAS's own Code of Ethics (the "Code of Ethics"), Code of Ethics for Senior Financial Officers ("Officer's Code"), and Corporate Governance Guidelines;

(ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)    Remain informed as to how IAS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of IAS and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that IAS's operations would comply with all applicable laws and IAS's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38.     Each of the Individual Defendants further owed to IAS and the shareholders the duty of loyalty requiring that each favor IAS's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

39.     At all times relevant hereto, the Individual Defendants were the agents of each other and of IAS and were at all times acting within the course and scope of such agency.

40.     Because of their advisory, executive, managerial, and directorial positions with IAS, each of the Individual Defendants had access to adverse, non-public information about the Company.

41.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by IAS.

## IAS'S CODE OF ETHICS AND OFFICER'S CODE

42.     The stated purpose of IAS's Code of Ethics is to deter wrongdoing and promote:

1. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

2. full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

3. Compliance with applicable governmental laws, rules and regulations;

4. The prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

5. accountability for adherence to the Code.

43.     All Company directors, officers, and employees are required to be familiar with the Code of Ethics, comply with its provisions, and report suspected violations.

44. In a section titled "Honest and Ethical Conduct," the Code of Ethics states that the Company's policy is "to exhibit and promote high standards of integrity by conducting its affairs honestly and ethically." Specifically, the Code of Ethics states:

> Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job and must act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.

45. With respect to "Fair Dealing," the Code of Ethics states, in relevant part, that no director, officer, or employee "should take unfair advantage of anyone through manipulation, concealment, abuse, or privileged information, misrepresentation of facts or any other unfair dealing practice."

46. In a section titled "Compliance," the Code of Ethics states, in relevant part, that directors, officers and employees "should comply both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates." The Code of Ethics further provides that "[i]nsider trading is unethical, illegal and a violation of the Company's Insider Trading Policy."

47. In a section titled "Disclosure," the Code of Ethics states:

> The Company's periodic reports and other documents filed with, or furnished to, the SEC and other regulators, including all financial statements and other financial information, along with other public communications made by the Company, must comply with applicable federal securities laws and SEC rules.

> Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

1) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

2) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

48. With respect to enforcement of the Code of Ethics, the Code of Ethics provides, in relevant part:

Upon receipt of a determination that there has been a violation of this Code, the Board, the Chair of the Audit Committee, or the head of Human Resources in consultation with the General Counsel will take such preventative or disciplinary action as it deems appropriate, including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities.

49. The Company's Officer's Code applies to the CEO, CFO, the principal accounting officer, the controller and all persons performing similar functions (collectively, the "Senior Financial Officers"). In addition to the Code of Ethics, each Senior Financial Officer is required to annually signa certification form indicating compliance with the Officer's Code.

50. The Officer's Code provides, in relevant part:

Each Senior Financial Officer shall exhibit and promote the highest standards of honesty and ethical business conduct, including acting in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts (including omissions of material facts) or allowing their independent judgment to be subordinated. Each Senior Financial Officer shall establish, maintain and support policies and procedures that encourage and reward professional integrity in all aspects of the Company's organization and shall ensure an environment exists within the Company that eliminates inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal or alienation from other employees within the Company.

51. With respect to the Company's public reporting controls and compliance with reporting and securities laws and regulations, the Officer's Code states, in relevant part:

II. Each Senior Financial Officer is responsible for full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or furnishes to, the Securities and Exchange Commission (the "SEC") and other regulators, and in other public communications made by the Company. Accordingly, it is the responsibility of each Senior Financial Officer to (a) promptly bring to the attention of the General Counsel or the Audit Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its SEC filings and public communications and(b)otherwise assist the General Counsel or the Audit Committee, as applicable and as necessary, in fulfilling the responsibilities specified in the Company's policies and procedures regarding financial reporting and disclosure.

III. Each Senior Financial Officer shall promptly bring to the attention of the General Counsel or the Audit Committee any information he or she may have concerning (a)significant deficiencies or material weaknesses in the design or operation of internal controls, which could adversely affect the Company's ability to record, process, summarize and report financial information in the time frames prescribed by the rules of the Securities Exchange Act of 1934, or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

*          *          *

V. Each Senior Financial Officer shall endeavor to comply with all securities and other laws, rules and regulations of federal, state and local governments and other private and public regulatory authorities that are applicable to the Company and its operations. Each Senior Financial Officer shall promptly bring to the attention of the General Counsel or the Audit Committee any information he or she may have concerning evidence of a violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, or of a violation of the Code of Ethics or of a violation of this Code.

## IAS'S AUDIT COMMITTEE CHARTER

52.    IAS's Audit Committee Charter states that the Audit Committee's principal functions are to assist the Board in its oversight of:

- the integrity of accounting and financial reporting processes of IAS and the audits of the financial statements of IAS;

- the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by IAS' independent auditor (the "Independent Auditor") and IAS' financial and senior management;

- the qualifications, independence and performance of the Independent

Auditor;

- risk assessment and risk management;

- the performance of IAS' internal audit function; and

- compliance by IAS withl egal and regulatory requirements.

53.    In a section titled "Responsibilities and Duties," the Audit Committee Charter states, in relevant part, that the Audit Committee has the following duties and responsibilities with respect to "Financial Statements and Disclosures":

1.    Review with management and the Independent Auditor IAS' quarterly and annual financial statements, as well as analyses prepared by management or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

*            *            *

4.    In connection with the Committee's review of the annual audited financial statements:

- Discuss with the Independent Auditor and management the financial statements (including the related notes) and the results of the Independent Auditor's audit of the financial statements;

- Discuss any items required to be communicated by the Independent Auditor in accordance with the applicable requirements of the Public Company Accounting Oversight Board(the "PCAOB").These discussions should include an overview of the planned scope and timing of the audit, the Independent Auditor's judgments about the quality and appropriateness of IAS' accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in IAS' financial statements, the representations the Independent Auditor are requesting from IAS' management, any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information;

- Discuss with IAS' management and the Independent Auditor IAS' selection, application and disclosure of critical accounting policies and practices;

- Review with the Independent Auditor the form of audit opinion to be issued by the Independent Auditor on the financial statements and notes thereto; and

- Review IAS' specific disclosure under Management's Discussion and Analysis of Financial Condition and Operation.

5. Recommend to the Board whether the annual audited financial statements (including the related notes) should be included in IAS' Annual Report on Form10-K or should otherwise by approved.

6. In connection with the Committee's review of the quarterly financial statements:

   • Discuss with the Independent Auditor and IAS' management the results of the Independent Auditor's SAS No. 100, Interim Financial Information (Codification of Statements on Auditing Standards, AU § 722) or similar review of the quarterly financial statements;

   • Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with IAS' management and the Independent Auditor; and

   • Review IAS' specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations.

7. Review and discuss with management and the Independent Auditor IAS' earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information as well as key performance indicators disclosed by IAS; and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made, paying particular attention to the use of "proforma" or "adjusted" nonGAAP information, as well as key performance indicators disclosed by IAS. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which IAS provides earnings guidance need not be discussed in advance.

8. Review with management and the Independent Auditor:

   • Any major issues regarding accounting principles and financial statement presentations, including any significant changes in IAS' selection or application of accounting principles;

   • The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on IAS' financial statements;

   • Consideration of the judgment of both management and the Independent Auditor about the quality, not just the acceptability, of accounting principles; and

   • The completeness and clarity of the disclosures in the financial statements.

9. Discuss with the Independent Auditor material issues on which the national office of the independent auditor was consulted by IAS' audit team.

54.     With respect to "Internal Controls," the Audit Committee's functions and responsibilities include, in relevant part:

> 10. Periodically discuss with IAS' principal accounting officer and principal in-house legal counsel the function of IAS' disclosure controls and procedures and any disclosure committee that may be established by IAS. Discuss with IAS' Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of IAS' disclosure controls and procedures and the required management certifications to be included in or attached as exhibits to IAS' Annual Report on Form 10-K or Quarterly Report on Form10-Q, as applicable.

> 11. Review and discuss with the Independent Auditor and IAS' management their periodic reviews of the adequacy of IAS' accounting and financial reporting processes and systems of internal control, including any significant deficiencies, material weaknesses or other major deficiencies in their design or operation, any material changes in such processes and systems, and any special audit steps or changes adopted in light of any material control deficiencies. Review and discuss with management controls regarding non-GAAP financial information and key performance indicators disclosed by IAS.

> 12. Review any allegations of fraud involving management or any employee of IAS with a significant role in IAS' internal controls over financial reporting that are disclosed to the Committee.

## SUBSTANTIVE ALLEGATIONS

55.     IAS creates products for agencies and marketers, programmatic players and media sellers designed to help publishers globally deliver ad inventory that is fraud free, viewable, brand safe and suitable, and geographically targeted. The Company measures revenue from three distinct channels: (i) Optimization revenue, formerly referred to as "programmatic" revenue; (ii) Measurement revenue; and (iii) Publisher revenue.

56.     IAS generates revenue by charging a cost per thousand quality impressions ("CPM") based on the volume of purchased digital ads that it analyzes for advertiser and publisher customers, including customers that utilize IAS's integration partners for their ad campaigns.

57.     The Company's Optimization channel comprises its pre-bid solutions designed to help optimize return on ad spend by directing budgets to the most effective inventory. For the year

ended 2024, IAS's Optimization revenue of $242.6 million represented approximately 46% of the

Company's total revenue.

***Materially False and Misleading Statements***

58.    On March 2, 2023, IAS issued a press release announcing results for the fourth

quarter and full year ended December 31, 2022. The press release provided, in relevant part:

> "We reported positive fourth quarter results with growth across all business lines,"
> said Lisa Utzschneider, CEO of IAS. "We are off to a solid start to 2023 and expect
> full-year, double-digit revenue growth as we drive customer adoption of our
> industry-leading products."
>
> \*                \*                \*
>
> **Fourth Quarter 2022 Financial Highlights**
>
> - **Total revenue** was $117.4 million, a 15% increase compared to $102.5
>   million in the prior-year period.
> - **Programmatic revenue** was $55.1 million, a 30% increase compared to
>   $42.3 million in the prior-year period.
> - **Advertiser direct revenue** was $44.7 million, a 2% increase compared to
>   $43.9 million in the prior-year period.
> - **Supply side revenue** was $17.6 million, a 9% increase compared to $16.2
>   million in the prior-year period.
>
> \*                \*                \*
>
> **Financial Outlook**
>
> Tania Secor, CFO of IAS, commented, "Our 2023 financial outlook reflects our
> commitment to profitable growth. We expect adjusted EBITDA margin
> improvement resulting from our more streamlined and efficient operations,
> primarily due to the restructuring in the fourth quarter. At the same time, we will
> continue to invest in targeted initiatives in 2023 to support our long-term growth."
>
> IAS expects revenue and adjusted EBITDA for the first quarter and full year 2023
> in the following ranges:
>
> **First Quarter Ending March 31, 2023**:
>
> - **Total revenue** of $102 million to $104 million
> - **Adjusted EBITDA** of $29 million to $31 million
>
> **Year Ending December 31, 2023**:

- **Total revenue** of $453 million to $463 million
- **Adjusted EBITDA** of $141 million to $149 million

59.    Also on March 2, 2023, the Company hosted an earnings call with analysts and

investors to discuss results. During the call, Defendant Utzschneider stated:

> In 2022, we won several large multiyear deals, including JPMorgan Chase, LinkedIn, Progressive and Kimberly-Clark. Today, we are excited to announce several new competitive wins that reinforce our standing in the market as the leading provider and formidable competitor. Ford, Hershey, Bel and Kering selected IAS after extensive tech and product due diligence versus other competitors. As these are major global wins with marquee brands we'd like to walk you through why they chose to partner with IAS.
>
> Ford selected IAS as their global ad verification partner. We expect to expand our coverage with Ford from 17 to over 50 markets, including the U.S. which has been serviced by an incumbent provider. We are proud that our robust brand safety technology continues to attract new customers.
>
> Hershey chose IAS based on our differentiate CTV technology, campaign automation and high standard of service.
>
> Bel, a world leader in branded cheese, including Babybel, and a major player in the healthy snacking segment, awarded IAS with a global deal. Bel was impressed by IAS' measurement capabilities, our integrations with the leading tech partners and our superior customer service.
>
> Kering, a major worldwide luxury group with notable brands such as Gucci and Yves Saint Laurent, signed a global deal with IAS in the first quarter of 2023. We clinched this win as a result of our leadership in the luxury vertical, superior technology, integrations with Google, and exceptional client support.
>
> *      *      *
>
> Our products have never been more relevant as marketers lean into our differentiated solutions. IAS enables safe content to thrive which results in greater efficiency and return on ad spend for marketers and increased yields and optimization for publishers. Our model is highly differentiated as our pricing is independent of the media rates negotiated e-CPMs directly with marketers. We're a volume-based model and not immune to volatility in ad spend. However, the essential nature of our solutions provides us with some level of insulation. Building on our accomplishments in 2022, we plan to continue to innovate further on behalf of our customers with data as the foundation. Under the leadership of our new CTO, we are enhancing our tech stack for greater scale and the ability to access, process and analyze data to feel superior results for marketers. This will enable us to support future growth and innovation in high-growth areas.

In conclusion, we made tremendous strides in 2022 to position IAS for long-term success. We strengthened our leadership team, invested in high-growth areas and solidified our partnerships. We are thrilled to extend our market presence with recent logo wins, which highlights the success of our new go-to-market strategy. I am excited to unleash the potential of IAS in 2023 and beyond. We are geared up and ready to go.

60.    Also on March 2, 2023, IAS filed its annual report on Form 10-K for the period ending December 21, 2022 ("2022 10-K") with the SEC. The 2022 10-K was signed by Defendants Utzschneider, Secor, Aliabadi, Berkes, Fosnaugh, Heller, Lema, Nakatsukasa, Putman, and Taylor. Defendants Utzschneider and Secor each also provided signed certifications pursuant to the Sarbanex-Oxley Act of 2002 that the information contained in the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

61.    With respect to pricing pressure, the 2022 10-K stated, in relevant part:

[C]ompetitors may be better able to respond quickly to new technologies, develop deeper relationships, or offer competitive services at lower prices. Any of these developments would make it more difficult for us to sell our platform and **_could result in increased pricing pressure_**.

\*                    \*                    \*

The intense competition we face in the sales of our products and services and general economic and business conditions **_could put pressure on us to change our prices_**.

\*                    \*                    \*

Some of our competitors may bundle products for promotional purposes or as a long-term pricing strategy, commit to large customer deployments at prices that are unprofitable or provide certain guarantees. **_These practices could, over time, significantly constrain the prices that we charge for certain of our offerings_**. If we do not adapt our pricing models to reflect changes in customer use of our products or changes in customer demand, our revenues could decrease.[2]

---

[2] Emphases added unless otherwise indicated.

62.    On March 7, 2023, Defendant Utzschneider represented IAS at the JMP Securities Technology Conference. During the conference, in response to a question of what "differentiates IAS from competitors[,]" Defendant Utzschneider stated:

> Ford, Hershey, iconic brands. Few reasons why the team is putting the wins on the board and why these marketers are choosing IAS. Global footprint, we talked about that before being a big differentiator. Every single one of those four wins were a competitive RFP jump ball against our competitors. We directly won the business. All four of them, deep, deep, deep product and tech diligence. And we were able to demonstrate the sophistication of our technology and also demonstrate our investments in our product and tech. Global service, so we've been investing heavily in client service. I—this is my third sort of macroeconomic environment in my career, living through it and marketers, they deeply care about client service, especially in down economies ROI and efficiency.
>
> So I would say it was—it's all those reasons, and then also investments, as we talked about before in brand safety, brand suitability, and CTV.

63.    On March 8, 2023, during the Morgan Stanley Technology, Media & Telecom Conference, Defendant Utzschneider was asked by analysts, "[w]hen it comes down to the IAS offering, what are the reasons that you would highlight the most that people pick you over your competition? And in the last couple of years, is there anything you've highlighted—you would highlight that you developed that's helped to create that differentiation?" In response, Defendant Utzschneider stated:

> So a couple of reasons for differentiation, and why advertisers like Ford or Hershey's are leaning in and choosing IAS. I mentioned it before, but our global footprint, IAS was in EMEA. Almost nine years ago, placed ourselves in EMEA and APAC, and we have deep roots in both regions. We've also been investing in emerging markets. So think of emerging markets like Latin America, Southeast Asia, India, Northern Europe. These global marketers like Nestlé, Coke, GlaxoSmithKline are having a broad global footprint, it really matters to the marketers because they are running their branded advertising everywhere.
>
> So, global footprint matters. The differentiation of our product offering and technology. I would say in particular, our context control technology, the fact that we can classify content both based on semantic and sentiment or emotion, that's a big differentiator that our tech can detect things like hate speech. Our multimedia classification within the live feeds of the social platforms. TikTok, we have an incredible global partnership with TikTok. And we're now able to classify live

video, image, audio. I know it's cool, and text within the live feed of TikTok. We're able to identify objects. We're able to put a timestamp on when—I don't know how many of you use TikTok, how many amounts of you use TikTok, but within these TikTok videos, we can identify the objects, time stamp it, identify brands, identify celebrities, it's incredibly cool technology, it's ML AI-based, it's getting smarter, as we go and we've just gotten started. So I'd say technology. And then, I would say the third reason is global service. I mentioned it before, but we invested early on in global service to make sure, especially for these really large multimillion dollar accounts that we're providing high-touch service. Because they are leaning into IAS they're investing with us and they expect a level of service. So I would say those are the three reasons, global footprint, quality and accuracy of our technology, and our service.

64.    On April 10, 2023, IAS filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy") wherein Defendants solicited shareholder votes – in advance of an annual stockholder meeting held May 11, 2023 – in favor of proposals to (i) re-elect Defendants Berkes, Nakatsukasa, and Utzschneider as members of the Board; and (ii) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent public accounting firm for the year ending December 31, 2023.

65.    With respect to the Code of Ethics, the 2023 Proxy stated:

We have adopted a Code of Ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. Our Code of Ethics is available on our website. We intend to disclose any amendments to the Code of Ethics, or any waivers of its requirements that apply to our principal executive officer, principal financial officer and principal accounting officer, on our website at https://investors.integralads.com.

66.    In a section titled "Risk Oversight," the 2023 Proxy provides:

Our Board as a whole, and through its committees, has responsibility for the oversight of risk management. In this role, the Board oversees the risk management processes designed and implemented by our management to ensure such processes are adequate and functioning as designed. Additionally, the Board sets the tone at the top as it relates to the approach to enterprise-wide risk management, designed to support the achievement of organizational objectives, including capital structure and strategic objectives to improve long-term organizational performance and enhance stockholder value. A fundamental part of risk management is not only understanding the most significant risks a company faces and what steps management is taking to monitor and control those risks, but also understanding what level of risk is appropriate for any given company. The involvement of the

full Board in reviewing our business and related risk exposures is an integral aspect of its assessment of the Company's risk profile and appropriate level of risk. Our Board appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge. In addition, our Board is actively involved in overseeing our management of risk enterprise by receiving detailed regular reports and engaging in discussion with members of our senior management and other personnel that include assessments and potential mitigation of the risks and exposures involved with their respective areas of responsibility.

While our full Board has overall responsibility for risk oversight, it has delegated primary oversight of certain risks to its committees. Our Audit Committee regularly monitors our major financial and security risk exposures, and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. In addition, our Audit Committee is committed to the prevention, timely detection, and mitigation of the effects of cybersecurity threats or incidents to the Company. Our Audit Committee also monitors compliance with legal and regulatory requirements and management provides our Audit Committee periodic reports on our compliance programs.

Our Compensation and Nominating Committee oversees the design and implementation of our compensation policies and programs and monitors the incentives created by these policies and programs to determine whether they encourage excessive risk-taking. Our Compensation and Nominating Committee also assesses the relationship between risk management policies and practices and compensation, and evaluates compensation policies and practices that could mitigate any such risk. Our Compensation and Nominating Committee oversees our major corporate governance risks, including through monitoring the effectiveness of the Company's environmental, social and governance efforts. The Company has determined that any risks arising from its compensation programs and policies are not reasonably likely to have a material adverse effect on the Company. We are reviewing the final rule issued by the SEC implementing the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act relating to recoupment of incentive-based compensation and will adopt a clawback policy when NASDAQ adopts listing standards in accordance with the final rules.

As with senior management, all committees report to the full Board as appropriate, including when a matter rises to the level of a material or enterprise level risk. We believe that the leadership structure of the Board supports effective risk management oversight.

We are committed to ensuring our Board and its committees are consistently updated on threats to our business and receive consistent updates on risk mitigation processes. At periodic meetings of our Board and its committees, management reports to and seeks guidance from our Board and its committees with respect to the most significant risks that could affect our business, such as legal risks,

cybersecurity and privacy risks, and financial, tax and audit related risks.

67.     The 2023 Proxy failed to disclose that the Company was beset with compliance problems that posed significant risks of harm. The 2023 Proxy also was false and misleading in that it failed to disclose that: (1) the Company lacked sufficient controls, including with respect to financial reporting; and (2) contrary to the 2023 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, and were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties.

68.     The 2023 Proxy further failed to disclose: (i) that the Company was experiencing a new material trend increased competitive pricing pressures; (ii) that, as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals.

69.     The false and misleading elements of the 2023 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors.

70.     On May 4, 2023, IAS issued a press release announcing first quarter 2023 financial results and stating, in relevant part:

> "We exceeded our first quarter outlook with increased demand across our product portfolio and benefited from several recent new customer wins," said Lisa Utzschneider, CEO of IAS. "Marketers trust IAS to measure and optimize their digital advertising spend while protecting brand safety. We are advancing our technology and platform partnerships to ensure our customers leverage actionable data in fast-growing channels."

24

**First Quarter 2023 Financial Highlights**

- **Total revenue** was $106.1 million, a 19% increase compared to $89.2 million in the prior-year period.
- **Programmatic revenue** was $51.0 million, a 26% increase compared to $40.6 million in the prior-year period.
- **Advertiser direct revenue** was $40.7 million, an 18% increase compared to $34.6 million in the prior-year period.
- **Supply side revenue** was $14.4 million, a 2% increase compared to $14.1 million in the prior-year period.

*          *          *

**Financial Outlook**

"In addition to strong top-line performance, we grew net income and adjusted EBITDA in the first quarter," said Tania Secor, CFO of IAS. "Our strong balance sheet and healthy cash flows allow us to invest in the growth of the business. We are raising our 2023 outlook to reflect our first quarter results and positive business momentum highlighted by new customer wins and expanded market opportunities."

IAS is introducing the following financial outlook for the second quarter of 2023 and increasing its full year 2023 outlook for revenue and adjusted EBITDA:

**Quarter Ending June 30, 2023**:

- **Total revenue** in the range of $111 million to $113 million
- **Adjusted EBITDA** in the range of $35 million to $37 million

**Year Ending December 31, 2023**:

- **Total revenue** in the range of $457 million to $465 million
- **Adjusted EBITDA** in the range of $147 million to $153 million[3]

71.    On June 13, 2023, during the Company's Analyst and Investor Day, Defendant

Utzschneider voiced concerns over the stability of pricing, stating:

So let's spend a couple of minutes on pricing. ***I know many of you are also very interested to hear about how our pricing works***, because we've had a lot of questions on this in some of our one-on-ones. So I wanted to put together just a very simple explanation of how our pricing works because it is actually quite simple.

In terms of measurement, optimization and publisher, we charge a fixed cost per

---

[3] Emphases in original.

1,000 of impressions multiplied by the number of impressions. The CPMs are fixed, we negotiate those CPMs either with the agency, the advertiser or the publisher. And our volume is variable based on industry trends and economic conditions. This approach provides us with stability and visibility into our rates, and we do not have volatility based on the media rates.

Another slide on pricing. The bars in this chart represent our CPM for some of our most popular offerings. The customer journey starts with measurement. It expands to optimization. And you can see, because of the strong customer value proposition that our tech provides, we have a much higher CPM for our optimization business than we do for our measurement business. As a result, the total cart value or the cumulative CPM of our offerings can be as high as six times our measurement CPM.

Now, I know you've seen the slide, both Yannis and Lisa presented it today, but I wanted to bring it up again because it's a very good framework of how to think about what's driven our revenue growth historically and what will continue to drive our revenue going forward.

Another point I'd like to make is that we have sticky and deep integrations with our platform partners. The nature of our revenue is reoccurring. And while the economic environment is a factor that influences impressions, we are well diversified across a variety of industries and we have stability from our fixed CPMs.

72.    During the same June 13, 2023, Analyst and Investor Day conference, Defendant

Secor added, in relevant part:

To conclude, ***we have a very attractive and sustainable financial profile***. And we will continue to pursue this balance of both revenue growth and profitability. You've heard today about the multiple drivers of growth for our business and how we are very well-positioned to continue to benefit from these trends. So going forward, we will focus on maintaining double-digit revenue growth and 30% plus percent EBITDA margins for the foreseeable future. And finally, we expect to continue to generate very strong free cash flow to continue to enhance our already strong balance sheet.

*            *            *

I would say to that, … with the fixed CPMs that we have across our offerings, we do benefit when we see big spikes in volume like we did in the first quarter. Our measurement volume was up 29%. At the same time, especially given all of the different offerings we have across the different markets, ***we also have a very strong pricing function*** and we always look for opportunity to look at where there could be opportunity, especially given the value that our tech provides and the customer value proposition for the customer.

26

73.     During the Analyst and Investor Day, one analyst asked "How are customer conversations going around price elasticity or like elasticity… ? And so how are they thinking about the price as part of this whole equation?" Another analyst inquired "When was the last time you guys have actually increased your prices?" In response, Defendant Utzschneider stated: "as the world continues to shift to video, everyone knows, video, CTV demand a higher eCPM and I think that will also balance out any pricing fluctuations in the ecosystem, not with us. *We have been able to maintain price*."

74.     The Company also provided a presentation during the June 13, 2023 Analyst and Investors Day in which IAS attributed its "ATTRACTIVE AND SUSTAINABLE FINANCIAL PROFILE" in part to the Company's "Favorable pricing structure," which the presentation identifies as one of two "DRIVERS OF SUSTAINABLE GROWTH."

75.     On August 9, 2023, Defendant Secor represented the Company at the Oppenheimer 26th Annual Technology, Internet & Communications Conference. In response to an analyst's question asking Secor to "unpack price versus volume trends," Defendant Secor stated "Our revenue is a function it's a very simple revenue model. It's a function of price, …"

76.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose that: (i) the Company was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals. As a result, the Individual Defendants caused the Company's public statements to be

materially false and misleading at all relevant times.

***The Truth Emerges While Misleading Statements Continue***

77.     The truth began to emerge on August 3, 2023 when the Company issued a press release announcing second quarter 2023 financial results (the "2Q23 Press Release"). The 2Q23 Press Release stated, in relevant part:

> "We continue to execute on our growth strategy with results for the second quarter ahead of our prior expectations," said Lisa Utzschneider, CEO of IAS. "We are leading with innovation as we scale our products to new markets with our platform partners and unlock valuable insights with increasingly actionable data. Our global business momentum continues with several new brand logos added recently."
>
> **Second Quarter 2023 Financial Highlights**
>
> - **Total revenue** was $113.7 million, a 13% increase compared to $100.3 million in the prior-year period.
> - **Optimization revenue** (f/k/a programmatic) was $52.8 million, a 10% increase compared to $47.9 million in the prior-year period.
> - **Measurement revenue** (f/k/a advertiser direct) was $44.9 million, a 23% increase compared to $36.6 million in the prior-year period.
> - **Publisher revenue** (f/k/a supply side) was $15.9 million, a 1% increase compared to $15.8 million in the prior-year period.
>
> *             *             *
>
> **Financial Outlook**
>
> "Our financial performance in the second quarter reflects our ability to meet our customers' needs with diverse offerings across the digital media ecosystem," said Tania Secor, CFO of IAS. "We expanded our margins during the quarter while investing in key growth areas. We continued to generate strong cash flow, which enabled us to pay down $20 million of debt in the period. We are on track to deliver a healthy mix of revenue growth and profitability for the full year."
>
> IAS is introducing the following financial outlook for the third quarter of 2023 and increasing the midpoint of its full year 2023 outlook for revenue and adjusted EBITDA:
>
> **Third Quarter Ending September 30, 2023**:
>
> - **Total revenue** of $112 million to $114 million
> - **Adjusted EBITDA** of $35 million to $37 million

28

**Year Ending December 31, 2023**:

- **Total revenue** of $459 million to $465 million
- **Adjusted EBITDA** of $149 million to $153 million[4]

78.    While the Company's Optimization revenue increased 10% year-over-year ("YoY"), this represented a substantial decline over every previous fiscal quarter reported since the Company's went public in June 2021. YoY Optimization revenue growth in the previous quarter, for instance, was 26%, while second quarter 2022 YoY Optimization revenue growth was 53%.

79.    During an earnings call with analysts and investors held the same day, Defendant Secor attributed the decline in optimization growth to factors other than pricing pressure:

> Optimization revenue formerly known as programmatic revenue grew 10% year-over-year in the second quarter to $52.8 million. Optimization revenue growth in the period reflects ***maturing context-controlled growth*** in line with our prior expectations, the contribution from new logo wins, and strength in the CPG vertical, partially ***offset by slower demand from tech/telco clients***. We are investing in optimization to drive continued adoption of our offerings. We are enhancing both our product capabilities and go-to-market engine.

80.    During the same call, Defendant Utzschneider acknowledged the "slight" decline in CPM in the Optimization segment but stated that IAS did not expect that trend to continue. Specifically, Defendant Utzschneider stated:

> [I]n the second quarter, we were really pleased to see optimization volumes continuing at Q1 levels of 14%. We did see ***a slight decline*** in the average CPM for the period, and it is an average, and that will reflect—averages is will reflect shifts in our product mix, shifts in our customers. And that can fluctuate from quarter-to-quarter, and ***we do not expect that trend to continue on optimization***. But, turning over to measurement, we were pleased for the measurement average
>
> CPM for the quarter the uptick, which was a reversal of what we saw in the first quarter, of down 6%. And that reflects the increase in video we reached a—50% of our measurement revenue was video-related. And as you all know, video is a premium to display, and that is what drove up the CPM in the second quarter on

---

[4] Emphases in original.

the measurement side.

81.    Following this news, on August 4, 2023, IAS's stock price declined $3.66 per share, or approximately 20%, from a closing price of $18.83 per share on August 3, 2023 to $15.17 per share on August 4, 2023.

82.    On September 8, 2023, Defendant Secor represented the Company at the 2023 Citi Global Technology Conference. In response to an analyst's question on the "broader pricing leverage in the platform and ... the effect of pricing and what that means across[,]" Defendant Secor stated:

> We have a really compelling business model and you see it in our strong net revenue retention, which was 115% in the second quarter. And what's driving that is the customer journey typically starts with measurement. Our pricing on measurement is at a certain level. And then as the customer expands into our products, particularly on the optimization side, which has a much higher CPM, there's an opportunity to drive velocity in our pricing of up to 5 to 6 times as the customer goes on that journey. So a lot of our revenue growth is driven by internal adoption.
>
> ***And what we're finding too is that our pricing, when the tech is there and we have such a strong customer value proposition, our pricing is higher***. And as the customer moves along that journey, they really value that value proposition and the enhancements that our tech solutions are driving on their digital media spend, and we're able to capture that price and you can see that in our uplift as customers expand revenue within our product suite.

83.    On December 5, 2023, Defendant Secor represented the Company at the Raymond James TMT and Consumer Conference. In response to an analyst's question concerning "the environment for pricing[,]" Defendant Secor stated:

> We enter into one- to three-year contracts with our clients and these are exclusive many times global contracts where we negotiate a CPM with these clients. These are fixed CPMs. But at times when we're introducing new technology like TMQ, ***we're able to drive a bit of a price increase***.
>
> Now, we're really focused on volume. We were really pleased in the third quarter to see our volume acceleration from the second quarter. So, volume growth across measurement and optimization were 25% and 19% respectively, which was up from the second quarter. And we did that ***while pricing was still consistent*** and so pleased to see that dynamic.

84.     The statements detailed above in the 2Q23 Press Release and at the 2023 Citi Global Technology Conference and Raymond James TMT and Consumer Conference were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose that: (i) IAS was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

85.     The full truth was revealed on February 27, 2024 when IAS announced fourth quarter and full year ended December 31, 2023 financial results. The Company also reported disappointing revenue guidance for the first quarter of 2024 of "$111 million to $113 million," below analyst expectations. Revenue guidance of "$530 million to $540 million," for the full year 2024 was similarly below analyst estimates.

86.     Also on February 27, 2024, during a conference call with analysts and investors, Defendant Utzschneider revealed:

> Our business today is weighted towards a loyal base of large advertising customers with an average tenure of over eight years for our top 100 marketers. At the end of the fourth quarter, we had 222 large advertising customers with annual spend of at least $200,000 per year.
>
> Revenue from these large advertising customers represented 87% of our total advertising revenue for the trailing twelve-month period. ***We are seeing more competitive pricing and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year***

***exclusive agreements. We have factored this dynamic into our growth outlook for 2024***.

87.    During the same February 27, 2024 call, Defendant Secor stated:

[O]ur first quarter outlook reflects ***more competitive pricing*** and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements. We have also factored into our Q1 outlook the implementation of previously negotiated pricing by one optimization account.

88.    During the question-and-answer portion of the call, Defendant Utzschneider engaged in the following exchange with one analyst:

*Anaylst*: I was hoping maybe you could expand a little bit on the pricing pressure that you're seeing beyond what you said in the prepared remarks. I guess, can we expect that to continue and be something that is a headwind throughout the year? I know you gave us full year guidance, but I guess what's the right way to think about that? And then second, I guess, just Q1, the growth rate, pretty big decel and then the second half, or I guess the remaining three quarters, a pretty nice uptick to get you to the full year, I guess. What are the moving pieces that should reaccelerate the growth beyond Q1?

*Defendant Utzschneider*: ***So, in terms of competitive pricing dynamics that we're seeing, as we mentioned in the script, we offered more competitive pricing*** and measurement on a select group of large contract renewals in exchange for volume commitments and multiyear exclusive agreements. The way to think about that is, yes, we were facing those competitive dynamics, but we thought it was the strategic thing to do is to ensure that we renew these large accounts and ensure that they drive up volume. Also, our strategy has been to secure measurement renewals so that we can upsell and cross-sell our offerings, expand geographies and ramp over time.

89.    On February 28, 2024, in response to this news, the Company's stock price declined $7.09, or approximately 41%, to $10.01 per share from the previous day's close of $17.10 per share.

***Additional Revelations Following the Relevant Period***

90.    On November 1, 2024, a Public [Redacted] Verified Stockholder Derivative Complaint (the "Delaware Chancery Complaint") was filed in the Court of Chancery of the State of Delaware against Vista and certain of IAS directors affiliated with Vista: Aliabadi, Fosnaugh,

Lema, Nakatsukasa and Taylor. The Delaware Chancery Complaint is alleged, in part, on the review of documents obtained from the Company in a books and records demand made pursuant to 8 *Del. C.* § 220.

91.    The Delaware Chancery Complaint alleged, among other things:

Through its presence in the boardroom, Vista learned, beginning in February 2023, that IAS's revenue growth had started to slow. In consecutive quarterly Board meetings in February 2023 and May 2023, Vista's representatives and handpicked directors learned that IAS was experiencing "pricing pressure" in its ad verification and optimization businesses, and that the Company had resorted to cutting rates to win "marquis [sic] customers." As IAS management contemporaneously recognized, the Company heavily relies on maintaining a "[f]avorable pricing structure" as a key "driver[] of sustainable growth." Analysts likewise recognized that pricing is critical to the IAS's success and thus were "very interested to hear about how [the Company's] pricing works."

92.    With respect to the February 2023 Board meeting, for instance, the Delaware Chancery Complaint alleged that "the Board was expressly told that the Company faced pricing pressures." According to the Delaware Chancery Complaint, a slide redacted in the complaint showed that "in order to win 'marquis [sic] customers," the Company resorted to cutting rates charged when renewing and securing new contracts, leading to fee compression[.]"

93.    Similarly, the Delaware Chancery Complaint alleged that with respect to a May 2023 Board meeting:

For instance, on May 11, 2023, the Board held a "CEO Session" during a meeting attended by Director Defendants Fosnaugh, Lema, and Nakatsukasa, and Vista representative and Head of Equity Capital Markets Ashley MacNeill. Through this "CEO Session," the Board learned that one of the "lowlights" of the "state of the business" was "increased customer pressure to prove Programmatic [i.e., optimization] value vs. agency or free alternatives." The Board also learned in a finance presentation made during this meeting that another "lowlight" was "continued pricing pressure to win marquis [sic] customers and focus on ROI and efficiency leading clients to look at lower-priced / free programmatic [i.e., optimization] solutions." Indeed, one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "Aggressive

Pricing."[5]

94.     The Delaware Chancery Complaint alleged, in relevant part, with respect to an

August 1, 2023 Board meeting:

> On August 1, 2023, the Board met with Aliabadi, Fosnaugh, Lema, Nakatsukasa, and Taylor in attendance, among others. Materials distributed to the Board in advance of the meeting confirmed that the Company experienced "lower than expected Optimization growth[,]" noting that it "expect[ed] this trend to continue." Revenue results from the first half of 2023 showed that "Optimization growth of 26% [in] Q1 slow[ed] to 10% [in] Q2[,] driven by slowdown of Context Control [REDACTED]" Pricing concerns were also highlighted, stating that [REDACTED] and that there was "[c]ontinued [c]ompetition in Programmatic" because "[a]dvertisers are increasingly cost conscious due to macroeconomic conditions[.]

95.     The Delaware Chancery Complaint alleged, in relevant part, with respect to a

November 9, 2023 Board meeting:

> On November 9, 2023, the Board met and reviewed a preliminary forecast for 2024, or "Preliminary 2024 AOP [Annual Operating Plan]." This meeting was attended by the full Board, including Director Defendants Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor, as well as Vista representative and Head of Equity Capital Markets Ashley MacNeill.

> During this meeting, as part of the "Executive Summary" of the projections, the Board learned that "[t]he competitive pricing environment has accelerated in the past few months and [is] expected to negatively impact 2024."

96.     Accordingly, before and during the Relevant Period, the Individual Defendants

were aware of "continued pricing pressure" to win customers and that, as a result, IAS resorted to

cutting rates charged when renewing and securing new contracts.

***Harm to the Company***

97.     As a direct and proximate result of the Individual Defendants' misconduct, IAS has

lost and expended, and will lose and expend, millions of dollars.

---

[5] Footnotes in the Delaware Chancery Complaint omitted.

98.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

99.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

100.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

102.    Plaintiff will adequately and fairly represent the interests of IAS and its shareholders in enforcing and prosecuting its rights.

103.    IAS is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

104.    Plaintiff is a current shareholder of IAS and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

105.    A pre-suit demand on the Board of IAS is futile and, therefore, excused.  At the time this action was commenced, the ten-member Board consisted of Individual Defendants Utzschneider, Fosnaugh, Heller, Lema, Putman, Aliabadi, Taylor, Berkes, and Nakatsukasa (the "Director Defendants") as well as non-party Robert Lord.  Accordingly, Plaintiff need only show

that demand is futile as to five current directors. As set forth below, all nine Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

106.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

107.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

108.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

109.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of IAS, the Director Defendants knew, or should have known, the material facts surrounding the Company's pricing pressure and declining revenue growth.

110.    Moreover, each of the nine Director Defendants signed the 2022 10-K. Defendant Utzschneider also provided signed certifications pursuant to the Sarbanex-Oxley Act of 2002 that the information contained in the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

111.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

112.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

113.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

114.    Defendants Putman, Heller, and Berkes (the "Audit Defendants") serve or served on the Company's Audit Committee during the Relevant Period, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying

internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

115.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

116.    Moreover, Director Defendants Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor (the "Vista Affiliated Directors") lack independence from Vista, IAS's controlling stockholder. The Vista Affiliated Directors are dual fiduciaries who currently serve as executives for Vista and/or its affiliated funds, are actively involved Vista's investments, and sit on the boards of Vista portfolio companies. As alleged in the Delaware Chancery Complaint, Vista sold approximately $477 million worth of Company stock while in possession of negative, material, non-public information regarding IAS, *i.e.*, that the Company was facing pricing pressure and declining revenue growth. As a result of these sales, Vista was able to avoid approximately $269.4 million in losses due to declines in the Company's stock price once the negative information

reached the public market. In allowing such, the Vista Affiliated Directors prioritized Vista's financial interests above the interests of IAS and its stockholders. Accordingly, Director Defendants Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor cannot give fair and disinterested consideration to a demand.

117.    Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

**Against the Director Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

120.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

121.    Under the direction and watch of the Director Defendants, the 2023 Proxy failed to disclose, *inter alia*, that the Company was beset with compliance problems that posed significant

risks of harm. The 2023 Proxy also was false and misleading in that it failed to disclose that: (1) the Company lacked sufficient controls, including with respect to financial reporting; and (2) contrary to the 2023 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, and were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties.

122.    The 2023 Proxy further failed to disclose: (i) that the Company was experiencing a new material trend increased competitive pricing pressures; (ii) that, as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals.

123.    In the exercise of reasonable care, these Defendants should have known that the statements contained in the 2023 Proxy were materially false and misleading.

124.    The misrepresentations and omissions in the 2023 Proxy were material to Company stockholders in voting on the 2023 Proxy. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in the 2023 Proxy, including but not limited to the reelection of certain Director Defendants.  The 2023 Proxy was an essential link in Defendants' insulation from stockholder challenge.

125.    The false and misleading elements of the 2023 Proxy led to, among other things, the election of Defendants Berkes, Nakatsukasa, and Utzschneider, which allowed them to continue to breach their fiduciary duties to IAS.

126.    The Company was damaged as a result of the Defendants' material

misrepresentations and omissions in the 2023 Proxy.

127.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT II

**Against the Individual Defendants
For Breach of Fiduciary Duty**

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

130.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

131.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.    Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing

41

revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals.

133.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

134.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

135.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

136.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

137.    Plaintiff, on behalf of IAS, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

140.    Plaintiff on behalf of IAS has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, IAS.

143.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from IAS that was tied to the performance or artificially inflated valuation of IAS, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

144.    Plaintiff, as a shareholder and a representative of IAS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

145.    Plaintiff on behalf of IAS has no adequate remedy at law.

<u>**COUNT V**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

148.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

149.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

150.    Plaintiff on behalf IAS has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein,

together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: March 11, 2025

**RIGRODSKY LAW, P.A.**

By: */s/ Timothy J. MacFall*
   Timothy J. MacFall
   Vincent A. Licata
   825 East Gate Boulevard, Suite 300
   Garden City, NY 11530
   Telephone: (516) 683-3516
   Email: vl@rl-legal.com
     tjm@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place

1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com